UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LYNETTE MENDEZ,                              )
                                             )
                     Plaintiff,              )
          v.                                 )          CIVIL ACTION
                                             )          NO. 17-10069-JGD
NANCY A. BERRYHILL,[1] Acting Commissioner   )
of the Social Security Administration,       )
                                             )
                     Defendant.              )


# MEMORANDUM OF DECISION AND ORDER ON CROSS-MOTIONS REGARDING DENIAL OF SOCIAL SECURITY BENEFITS

June 18, 2018

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff, Lynette Mendez ("Mendez"), has brought this action, *pro se*, pursuant to

sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), in

order to challenge the final decision of the Commissioner of the Social Security Administration

("Commissioner") denying her claims for Social Security Disability Insurance ("SSDI") and

Supplemental Security Income ("SSI") benefits.  The matter is before the court on the plaintiff's

"Motion To Reverse Decision For SSDI" (Docket No. 19), by which the plaintiff requests that the

court reverse the decision to deny her claims for benefits.[2]  It is also before the court on the

---

[1]  Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill has been substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this action.

[2]  The court interprets Mendez's motion to request reversal of the Commissioner's decision to deny claims for both SSI and SSDI benefits.  The court notes, however, that Mendez refiled for and is currently receiving SSI benefits.  Therefore, she is only seeking SSI benefits for a limited period.

defendant's "Motion For Order Affirming The Commissioner's Decision" (Docket No. 20), by which the Commissioner is seeking an order upholding her determination that Mendez is not disabled within the meaning of the Social Security Act, and is therefore not entitled to SSI or SSDI benefits.  At issue is whether the decision of the Administrative Law Judge ("ALJ") that Mendez was not disabled is supported by substantial evidence.[3]  Additionally, Mendez filed with this court, two sets of documents for consideration, the vast majority of which were created after the date of the ALJ's decision and thus were not considered by the ALJ.  (See Dockets No. 22 & 24).  The Commissioner and this court interpret these submissions as a request for a remand pursuant to sentence six of 42 U.S.C. § 405(g).

A review of the record below, as well as the ALJ's decision, compels the conclusion that the ALJ's determination that Mendez was not disabled is supported by substantial evidence.  Furthermore, the additional records submitted on appeal to this court do not warrant remand under sentence six of 42 U.S.C. § 405(g).  Therefore, the plaintiff's motion to reverse is DENIED and the defendant's motion to affirm is ALLOWED.

---

[3] Mendez's motion does not contain objections to any specific finding of the ALJ, but rather argues that Mendez cannot work due to depression, mobility issues and pain in her left arm and neurological issues due to her stroke, back pain, and the side effects of her medication.  (See Docket No. 19).  In the absence of an objection by Mendez to any specific finding by the ALJ, this court interprets the argument Mendez has put forward in her motion to be a challenge to the ALJ's decision that she was not disabled.  Subsequent to filing her motion, Mendez filed additional documents for the court's consideration (Docket Nos. 22 & 24), which include two undated letters containing comments about the ALJ's decision and arguments as to why it was wrongly decided.  (Docket No. 22 at 6-9).  The court has considered these letters in support of her position that the ALJ's decision is not supported by the record, and has reviewed the additional medical information to determine if remand to the ALJ is appropriate.  If not addressed specifically herein, Mendez should be assured that the court has considered all of her arguments.

## II. **STATEMENT OF FACTS**[4]

### **Procedural History**

On or about April 18, 2014, Mendez filed applications for SSDI and SSI benefits, claiming that she had been unable to work since December 5, 2013 due to a stroke, depression, high blood pressure, and severe pain in her back, right leg, left arm and shoulder.  (Tr. 284; 300). Her applications were denied initially on August 1, 2014 (Tr. 116-43; 189-94) and upon recon- sideration on December 22, 2014.  (Tr. 144-87; 197-202).  Mendez then requested and was granted a hearing before an ALJ, which took place on March 24, 2016 in Boston, Massachusetts. (Tr. 65-93).  Mendez was represented by counsel, appeared, and testified at the hearing.  (Id.). The ALJ also obtained testimony from Dr. Amy Vercillo, a vocational expert ("VE"), who described Mendez's vocational background based on her past work experience and responded to hypothetical questions that were designed to determine whether jobs exist in the national and regional economies for an individual with the same age, educational background, work experience and Residual Functional Capacity ("RFC") as the plaintiff.  (Tr. 84-92).

On May 19, 2016, the ALJ issued a decision denying Mendez's claims for benefits.  (Tr. 45-54).  On June 15, 2016, Mendez appealed the decision to the Appeals Council.  (Tr. 38-41) The Appeals Council denied her claim for review on September 2, 2016 (Tr. 15-20), again on September 23, 2016 after receiving additional documentation (Tr. 10-14), and finally on November 17, 2016 after receiving further documentation (Tr. 1-6), thereby making the ALJ's decision the final decision of the Commissioner for purposes of review.  Accordingly, the

---

[4]  References to pages in the transcript of the record proceedings shall be cited as "Tr. ___."  The ALJ's Decision shall be cited as "Dec." and can be found beginning at Tr. 45.

plaintiff has exhausted all of her administrative remedies and the case is ripe for judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## Background

Mendez was born on February 10, 1972, and was 44 years old at the time of her hearing before the ALJ. (Tr. 71-72). She claims that she has been unable to work since suffering a stroke on December 5, 2013.

Mendez received her GED in 1999 (Tr. 1232), and in the past has worked in full-time positions as an administrative assistant for a produce company, a store manager in retail, a receptionist with a temp agency, a maintenance supervisor for a property management company, and most recently, as a receptionist for the Executive Office of Public Safety and Security for the Commonwealth of Massachusetts ("EOPSS"). (Tr. 72-73; 319). She stopped working at EOPSS in February 2011 and has not worked since. (Tr. 319). According to the ALJ, Mendez met the special earnings requirements of the Social Security Act, for SSDI purposes, through June 30, 2014. Thus, to be entitled to SSDI benefits, Mendez must prove that she was disabled on or before June 30, 2014.

Mendez has three daughters, who at the time of the administrative hearing were 27, 22, and 13 years old, respectively. (Tr. 74). Mendez's youngest daughter lives at home with her (id.) and, as of February 2016, was receiving SSI disability benefits with Mendez as the representative payee. (Tr. 1224). Mendez is separated from her husband and does not receive child support payments. (Tr. 1232). She receives food stamps, welfare benefits, and Section-8 benefits. (Tr. 1231-32).

## Physical Health History After the Claimed Date of Disability

Since suffering a stroke on December 5, 2013, Mendez sought treatment for a variety of medical conditions related to her stroke and other physical ailments. On appeal, she claims that her back pain, left arm pain, neurologic issues related to her stroke, headaches, and the side effects of her medications are disabling and prevent her from working.

### Stroke

On December 5, 2013, Mendez was admitted to the emergency room with an occluded carotid artery and cerebral infarction. (Tr. 528-29; 563). She was treated with tissue plasminogen activator therapy (Tr. 528-29; 535; 563) and also underwent thrombectomy and prosthetic patch angioplasty, right carotid artery. (Tr. 411). At her postoperative appointment on December 20, 2013, Mendez was evaluated by Dr. Magruder Donaldson who concluded that Mendez had made a "full recovery after major stroke, right carotid surgery" noted Mendez had "[m]ild headaches at times," "some incisional neuropathy," a "[w]ell healed right neck" and "no neuro[logical] findings" in her arms or legs, although there was "some sensory change adjacent to incision." (Tr. 409).

In February 2014, Mendez was evaluated by Dr. Donaldson after complaining of neck pain, shortness of breath, and irregular heartbeat. (Tr. 378). Dr. Donaldson noted a normal carotid artery, normal heartbeat, slight tenderness over the inferior end of the wound, and assessed a possible episode of atrial fibrillation with an overlay of severe anxiety. (Tr. 378). He also noted normal gait and no persistent motor dysfunction in Mendez's extremities. (Tr. 372).

On March 5, 2014, Mendez had a duplex ultrasound taken, which indicated patent right carotid endarterectomy with normal morphology and hemodynamics. (Tr. 413). Dr. Donaldson

summarized that this test result was normal. (Tr. 406). On March 25, 2014, a duplex ultra-sound was performed which showed normal arterial flow to the left arm. (Tr. 515). On May 12, 2014, Mendez complained of left upper extremity pain to her hematologist, Dr. Rasmia Khalid, who noted that Mendez was undergoing physical therapy. (Tr. 419). Later that month she complained of left upper extremity pain and hand numbness to her cardiologist, Dr. Eric Davidson, who noted that the duplex ultrasound taken in March 2014 indicated normal arterial flow. Dr. Davidson prescribed Coumadin. (Tr. 567-69).

In June of 2014, Mendez was evaluated by a neurologist, Dr. Joseph D'Alton, who noted that "[o]ver time, [Mendez] made significant improvement" from her stroke, that Mendez's neurologic exam was normal "except reduced dexterity in the left hand" and pain and limited movement in the left shoulder. (Tr. 654). Dr. D'Alton referred Mendez to an orthopedic surgeon for an opinion on Mendez's shoulder. (Id.). As of July 2014, Dr. Khalid noted only mild dysfunction in the upper left extremity. (Tr. 748). In August 2014, Dr. D'Alton noted that Mendez had not seen the orthopedic surgeon regarding her shoulder, and that she still had some limitation of left shoulder movement but that her shoulder was improved since June. (Tr. 753).

In August 2014, Mendez underwent an orthopedic evaluation by Dr. Serena J. Young and reported no improvement in upper left extremity pain with Neurontin, gabapentin and physical therapy. (Tr. 754). Mendez underwent a left shoulder MRI in October 2014, which showed mild degenerative changes and hypertrophy of the AC joint. (Tr. 805). Dr. Young noted that there was no shoulder structural cause for Mendez's pain, although she believed there could be some tendonitis. (Id.). Dr. Young referred her to pain management to discuss further

treatment options, and suggested there could be a nerve-related component to Mendez's pain due to stroke.  (Id.).  After October 2015, the record contains no further evidence of sustained care for stroke-related or cardiac-related issues.

Degenerative Disc Disease

On June 30, 2014, Mendez complained of right thigh numbness and worsening sciatica. (Tr. 589).  On examination, she had normal alignment, no visible or palpable defects, normal range of motion, 5/5 muscle strength, normal muscle tone, no abnormal movements, no atrophy, stable joints, normal gait, and good balance.  (Id.).  An MRI from July 2014 indicated stable L5-S1 left paracentral disc protrusion touching the traversing left S1 nerve root, no significant central canal or foraminal stenosis, and stable grade I retrolisthesis of L5 on S1.  (Tr. 650-51).  Dr. D'Alton summarized that the MRI showed "minor degenerative changes at several levels" but was "unchanged" since an MRI from 2013.  (Tr. 753).

In January 2015, Mendez was evaluated by Dr. Omar El Abd, a spine surgeon, reporting ongoing left arm pain, pain in her lower back, and numbness in the lateral right calf.  (Tr. 1017). On examination, she had no abnormal muscle wasting, no abnormal deformities, normal range of motion bilaterally in her upper and lower extremities, normal gait, intact sensation, and 5/5 muscle testing throughout except 4/5 manual muscle testing in the left upper extremity.  (Tr. 1017-18).  She had positive Spurling compression and root tension on the left along with positive pelvic rock and sustained hip flexion, and tenderness overlying the lumbar paraspinal area.  (Tr. 1019).  Dr. El Abd diagnosed left cervical radicular pain, left hemiparesis,[5] and lumbar

---

[5] "Hemiparesis" is defined as "muscular weakness or partial paralysis restricted to one side of the body."  See https://www.merriam-webster.com/medical/hemiparesis (last visited June 13, 2018).

and cervical disc displacement.  (Tr. 1019).  He also recommended she undergo an MRI of her cervical spine, which she did in March 2015.  (Tr. 1019).  The March 2015 MRI indicated protrusion at C3-4 pressing on the thecal sac, moderate right foraminal narrowing, and small protrusions from C4 through C7 unchanged since May 2012.  (Tr. 1303).  Dr. El Abd recommended lumbar steroid injection and possibly radiofrequency ablation and that Mendez continue to take tizanidine.  (Tr. 1303-04).

In June 2015, Mendez went to Disney World in Florida for vacation for a week,[6] and in July 2015 reported walking for two to five miles daily for exercise in preparation for bariatric surgery in September.  (Tr. 1181; 1483; 1485).

In August 2015, Mendez sought emergency care for low back pain after sweeping the floor and running out of her muscle relaxant.  On exam, there were no noted deficits.  (Tr. 1212-15).  She was given a Lidoderm patch, Tylenol and short-term prescriptions for Valium and Tramadol.  (Id.).

In November 2015, Mendez saw Dr. Renee Goetzler, one of her primary care physicians, who noted that since the bariatric surgery in September, Mendez had lost over 30 pounds, was off many of her former medications, felt "great," was walking for exercise at least 30 minutes per day and, although her back was still "uncomfortable," it was "better than before."  (Tr. 1319).  Mendez reported that her left arm was still painful and that made it hard to do Zumba.  (Id.).  Dr. Goetzler noted that Mendez's left arm had 3/5 strength, and referred Mendez to pain management and physical/occupational therapy.  (Tr. 1319-20).

---

[6]  While there is no question that Mendez went to Florida, Mendez contests that the trip was taken purely for pleasure.

In January 2016, Mendez saw Dr. Tomoya Sakai, a pain specialist, who on examination concluded Mendez had a normal gait, no tenderness in her cervical spine or trapezius muscles, full range of motion in cervical spine flexion, extension, rotation, and lateral bending, limited strength in her left upper extremity due to residual paresis and spasticity, and intact neurological functioning. (Tr. 1298-99). Dr. Sakai diagnosed spasticity of the left upper extremity, with left upper extremity pain and weakness, due to Mendez's stroke and less likely due to cervical radiculopathy, and prescribed Baclofen. (Tr. 1299).

In February 2016, Dr. Goetzler filled out a physical RFC form in which she opined that Mendez could only sit for 20 minutes and stand for five minutes total at one time; could sit for about four hours; could stand/walk for about two hours; could occasionally lift and carry less than 10 pounds; had significant limitations in doing repetitive reaching, handling or fingering; was able to stoop or crouch 0% of the time in an eight hour day; and that her symptoms were severe enough to interfere often with attention and concentration. (Tr. 1369-74).

### Mental Health History After the Claimed Date of Disability

In April 2014, Mendez's primary care physician, Dr. Jae Lee, diagnosed her with severe depression, though he noted that she had "normal judgment/insight," a "normal affect," and was oriented to time, place, and person. (Tr. 480-81). Dr. Lee prescribed Venlafaxine. (Tr. 482). In May 2014, Dr. Lee switched Mendez's prescription to Wellbutrin and referred her for a psychiatric evaluation for depression and anxiety. (Tr. 593-95). In June 2014, Dr. Lee noted that Mendez's depression was better but that she continued to have anxiety related to her health issues and that she reported that she was "always worried about being forgetful." (Tr. 589). Dr. Lee advised Mendez to follow up with a psychiatrist. (Tr. 590).

9

On July 11, 2014, Mendez underwent a mental health diagnostic intake at Spectrum Health Systems ("Spectrum"), where she underwent therapy and outpatient mental health treatment from July 2014 through June 2015.  Upon mental status examination at intake, Mendez was cooperative, well groomed, had an appropriate affect, with a worried and anxious mood, had limited insight, with an adequate fund of general knowledge and normal memory but impaired recall.  (Tr. 1053).  Additionally, she was "fully oriented," had a "logical/coherent" thought process, and denied delusions, hallucinations, and suicidal or homicidal ideations.  (Id.). A mental status exam conducted in August 2014 showed that Mendez was depressed but the exam was otherwise normal.  (Tr. 1037).  Mendez reported at the time to the practitioner that she had memory problems.  (Id.).  In October 2014, Mendez reported an increase in anxiety resulting from conflict between her daughters, and between herself and her neighbors.  (Tr. 1030-31).  In November 2014, Mendez had increased anxiety due to continued conflict with her neighbors.  (Tr. 1027).

In December 2014, as part of her appeal of the initial denial of her application for SSI and SSDI benefits, Mendez underwent a consultative examination with Steven Hentoff, Ph.D., who observed that Mendez had a depressed mood with tearfulness, seemed to be in significant discomfort, and had cognitive limitations.  (Tr. 808-12).  For example, he observed that Mendez was unable to count backwards from 20 to 1.  (Tr. 810).  Dr. Hentoff also observed that Mendez was greatly challenged by the demands of standardized testing and that overall results suggested significant impairment in memory function for both auditory and visual information. (Tr. 811).  He diagnosed Mendez with amnestic disorder due to recent stroke, depressive disorder, and rule out mood disorder due to stroke.  (Id.).  Furthermore, while he did not

provide an opinion on disability itself, leaving that opinion for the Agency, he recommended that due to her mental status, Mendez should be assigned a representative payee if the Agency were to determine that she was disabled.  (Tr. 812).

In January 2015, treatment notes from Spectrum noted that Mendez appeared to be managing her anxiety symptoms more effectively and that, even though she was tearful, she was able to regulate her emotions well and her mood was stable.  (Tr. 1024).

On March 19, 2015, Mendez saw Margaret Burley, RN, CNS, PC, PMHCNS-BC, and reported to Ms. Burley that she had social anxiety, was crying a lot and was "so depressed," got panic attacks, had memory problems, and feared driving.  (Tr. 1191).  Ms. Burley continued Mendez on Wellbutrin.  (Tr. 1192).

On March 26, 2015, Ms. Burley filled out a "Mental Impairment Questionnaire" regarding Mendez, co-signed by Dr. Mitchell Wangh.  (Tr. 1157-63).  In the questionnaire, Ms. Burley indicated that she had seen Mendez four times since August 2014 and that she had diagnosed Mendez with major depression and PTSD.  (Tr. 1157).  Ms. Burley opined that Mendez was moderately limited in activities of daily living, was markedly limited in maintaining social functioning and concentration, persistence and pace, and had continual episodes of deterioration or decompensation.  (Tr. 1162).  Ms. Burley further opined that Mendez was "seriously limited" in her ability to ask simple questions or request assistance, carry out very short and simple instructions, make simple work-related decisions, respond appropriately to changes in a routine work setting, and be aware of normal hazards and take appropriate precautions, and had no useful ability to function in any of 10 other mental abilities needed to do unskilled work.  (Tr. 1160-61).  She also opined that Mendez was seriously limited in the

mental abilities "needed to do particular types of jobs," including the ability to adhere to basic standards of neatness and cleanliness, interact appropriately with the general public, travel in an unfamiliar place, use public transportation, and maintain socially appropriate behavior. (Tr. 1161). Finally, she opined that Mendez would be absent from work more than three times per month and was presently unable to work outside of the home. (Tr. 1159).

In May 2015, Mendez switched from Wellbutrin to Topiramate due to headaches (Tr. 1185-86), and in late May she went through a medical evaluation in advance of her bariatric surgery. (Tr. 1357-59). At the evaluation, she denied anxiety, depression, and stress, and the physician noted that her mental status was "grossly normal." (Tr. 1357-58).

In June 2015, Ms. Burley's treatment notes indicate that Mendez was "less depressed" and "happy and excited" that she was going on vacation with her daughter to Florida for a week. (Tr. 1181). Ms. Burley also noted that the Topiramate "helps with mood and headache prevention." (Id.). The last time Mendez appears to have been treated at Spectrum was in June 2015 and the administrative record shows no further treatment by mental health specialists.

In February 2016, Mendez complained of depression, panic attacks, and anxiety to her primary care physician, Dr. Goetzler, explaining that she had not seen her therapist in several months. (Tr. 1306). She also reported increased anxiety and depression due to the death of her grandmother, and that she was flying with her mother to the funeral.[7] (Id.). Dr. Goetzler provided a short-term prescription for Valium to help her with her trip for the funeral. (Tr.

---

[7] Mendez asserts that the funeral took place in Louisiana, while the ALJ wrote that it took place in Los Angeles. Regardless, it is clear that the record to which the ALJ was citing ambiguously identified the location of the funeral as taking place in "LA." (Tr. 1306).

1307).  The administrative record does not include any further mental health related treatment records.

**<u>Other Administrative Evidence</u>**

As a part of her application for benefits, Ms. Mendez completed a function report dated July 2, 2014, wherein she reported that she could prepare her own simple meals daily, though had difficulty remembering ingredients and needed timers, talked on the phone, shopped in stores weekly for up to three hours, could drive a car, pay bills, count change, handle a savings account, use a checkbook/money orders, went to doctors' appointments, cooked for her daughter, took her daughter to appointments, sometimes folded clothes, and sometimes wiped the kitchen counter.  (Tr. 311-18).

In connection with Mendez's application for social security disability benefits, two state agency consulting physicians, Dr. John Jao, M.D., and Dr. L. Zuniga, M.D., reviewed Mendez's medical records and issued corresponding opinions on the severity of her physical impairments and her residual functional capacity.

In July 2014, Dr. Jao, opined, after reviewing the record, that Mendez was limited to occasionally and frequently lifting up to 10 pounds, standing and walking for four hours, and sitting for six hours in an eight hour workday.  (Tr. 125).  He further opined that Mendez was unlimited in her ability to push and pull, but was limited to occasional climbing of ramps, stairs, ladders, ropes, scaffolds, and occasional balancing, stooping, kneeling, crouching, and crawling. (Tr. 125-26).  In November 2014, after reviewing the updated record, Dr. Zuniga came to the same conclusions as Dr. Jao with regard to Mendez's physical RFC.  (Tr. 159-60).

Two state agency psychological consultants, Lawrence Fieman, Ed.D. and Horace C.

Lukens, PhD, also reviewed Mendez's medical records and issued corresponding opinions on

the severity of her mental impairments and her residual functional capacity.  Dr. Fieman

reviewed the record in July 2014 and concluded that Mendez would improve to functional

levels and that her psychological symptoms would not meet the durational requirements.  (Tr.

137).  In December 2014, Dr. Lukens reviewed the record to date, including the report from

consulting examiner Dr. Hentoff, and opined that Mendez was able to understand and

remember simple instructions; was "moderately limited" in her ability to carry out detailed

instructions and to maintain attention and concentration for extended periods; was "not

significantly limited" in her ability to perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerances; was "not significantly limited" in her

ability to sustain an ordinary routine without special supervision; was "not significantly limited"

in her ability to work in coordination with or in proximity to others without being distracted by

them; was "not significantly limited" in her ability to make simple work-related decisions; was

"moderately limited" in her ability to complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace

without an unreasonable number and length of rest periods, specifically that she would have

moderate difficulty sustaining attention, concentration, and pace for "2/8/40"; was able to

engage in superficial social interactions without significant limitations; and was able to adapt to

changes in the work setting.   (Tr. 160-61).

On January 27, 2016, Mendez was interviewed at home as part of an investigation by

the Social Security Administration's Cooperative Disability Investigations Unit ("CDI unit").  The

investigation was triggered by an allegation of malingering and the inconsistency between Mendez's presentation before Dr. Hentoff and the medical evidence in the record. (Tr. 1222-33). During her interview, Mendez reported to a CDI investigator that she had no problems driving, recently traded in her car for a newer one and split the payments with her oldest daughter, handled all the money in the household and paid the monthly bills, was then the representative payee for her youngest daughter's social security benefits, could go outside when she needed to, could go outside alone, could take public transportation, could shop and attend scheduled appointments, bathed and dressed herself each morning, could take her medication on a daily basis without reminder, and was responsible for keeping the apartment clean, including "cleaning, dishes, and doing the laundry." (Tr. 1231-33).

At her hearing before the ALJ on March 24, 2016, Mendez testified that she really did not walk, but was able to go up and down stairs, could sit for 20 to 30 minutes at a time and stand for 10 minutes at a time, her balance was "okay" while standing, that her left hand was very weak and shook, that she could only lift a gallon of milk with her right arm, not her left, that she had difficulty with fine motor skills, that neither physical therapy, occupational therapy, nor medication had helped her left arm issues, and that she had ongoing back pain. (Tr. 76-81). She also testified that she was forgetful and had difficulty concentrating. (Tr. 77; 84).

### The ALJ's Decision

The ALJ concluded that from December 5, 2013 through the date of his decision on May 19, 2016, Mendez "ha[d] not been under a disability, as defined in the Social Security Act," which defines "disability" as "the inability to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months."  (Dec. Finding #11; Tr. 54).  <u>See</u> <u>also</u> 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  There is no dispute that the ALJ, in reaching his decision that Mendez was not disabled, performed the five-step sequential evaluation required by 20 C.F.R. §§ 404.1520 and 416.920.  The procedure resulted in the following analysis, which is further detailed in the ALJ's "Findings of Fact and Conclusions of Law."  (<u>See</u> Dec. 3-10; Tr. 47-54).

The first inquiry in the five-step evaluation process is whether the claimant is "engaged in substantial gainful work activity[.]"  <u>Seavey v. Barnhart</u>, 276 F.3d 1, 5 (1st Cir. 2001).  If so, the claimant is automatically considered not disabled and the application for benefits is denied.  <u>See</u> <u>id.</u>  In this case, the ALJ found that the claimant had "not engaged in substantial gainful activity since December 5, 2013" and proceeded to the next step of the evaluation process. (Dec. Finding #2; Tr. 47).

The second inquiry is whether the claimant has a "severe impairment," meaning an "impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is deemed not to be disabled and the application for benefits is denied.  <u>See</u> <u>Seavey</u>, 276 F.3d at 5.  Here, the ALJ determined that Mendez suffered from the severe impairments of post-traumatic stress disorder ("PTSD"), major depressive disorder, cerebrovascular accident, anemia, cardiac dysrhythmias, circulatory disorder, and degenerative disc disease.  (Dec. Finding #3; Tr. 47).

The ALJ then proceeded to step three of the analysis. The third inquiry is whether the claimant has an impairment equivalent to a specific list of impairments contained in Appendix 1 of the Social Security regulations, in which case the claimant would automatically be found disabled. See Seavey, 276 F.3d at 5; 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At this step, the ALJ explained that he reviewed the medical evidence of record to determine whether any physical or mental impairments, or combination of impairments meet or medically equal the list of impairments in Appendix 1 of the Social Security regulations. The ALJ explained that "[n]o treating or examining physician has proffered findings that are equivalent in severity to the criteria of these or any other listed impairment." (Dec. 4; Tr. 48). He further stated that he had considered the opinions of the State agency consultants who had evaluated this issue at the initial and reconsideration levels of the administrative review process and had reached the same conclusion. The ALJ further evaluated Mendez's mental impairments under listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders), considered whether the impairments met the "paragraph B" and "paragraph C" criteria, and concluded that they did not. (Id.). The ALJ concluded that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1[.]" (Dec. Finding #4; Tr. 47). Consequently, he proceeded to step four.

The fourth inquiry asks whether "the applicant's 'residual functional capacity' is such that he or she can still perform past relevant work[.]" Seavey, 276 F.3d at 5. Thus, in order to answer this inquiry, the ALJ must first make an assessment regarding the claimant's RFC. In the instant case, the ALJ assessed Mendez's RFC as follows:

After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)[8] except the claimant is able to lift 10 pounds occasionally and less than 10 pounds frequently, stand or walk at least 4 hours in an 8 hour day and sit (with normal breaks) about 6 hours in an 8 hour workday, has the occasional ability to climb, balance, stoop, kneel, crouch or crawl but never climb a ladder, occasional ability to push and pull with the left upper extremity and work is limited to only occasional contact with [the] public, co-workers and supervisors and must be limited to the performance of simple, routine and repetitive instructions.

(Dec. Finding #5; Tr. 49 (footnote added)).

In reaching his conclusion regarding the plaintiff's RFC, the ALJ first considered all of Mendez's symptoms and the extent to which those symptoms were consistent with the objective medical evidence and other evidence in the record. (Dec. 5; Tr. 49). Accordingly, the ALJ reviewed the plaintiff's medical records and considered the available opinion evidence, as well as statements that Mendez had made at the hearing regarding her symptoms and the extent to which those symptoms interfered with her ability to carry out day-to-day activities. (See Dec. 5-9; Tr. 49-53). Because the ALJ found that Mendez's medically determinable impairments could reasonably be expected to cause some alleged symptoms, he went on to determine whether her subjective statements about the limiting effects of her symptoms were credible in light of the entire record. (See Dec. 8-9; Tr. 52-3). The ALJ concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the

---

[8] 20 C.F.R. §§ 404.1567(a) and 416.967(a) define "sedentary work" as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."

record for the reasons explained in this decision."  (Dec. 8; Tr. 52).  Mendez contests this conclusion.

After explaining the basis for his RFC determination, the ALJ concluded that Mendez was not capable of performing any past relevant work.  (Dec. Finding #6; Tr. 53).  See 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) ("At the fourth step, we consider our assessment of your [RFC] and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.").  Therefore, the ALJ continued to step five.

The fifth inquiry is whether, given the claimant's RFC, education, work experience, and age, the claimant is capable of performing other work.  See Seavey, 276 F.3d at 5; 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If so, the claimant is not disabled.  Id.  At step five, the Commissioner has the burden "of coming forward with evidence of specific jobs in the national economy that the applicant can still perform."  Seavey, 276 F.3d at 5.  Here, the ALJ relied on the VE's testimony to conclude that Mendez was capable of performing jobs that exist in significant numbers in the national economy, including the sedentary, unskilled occupations of a shipping clerk, an order clerk, and a visual inspector.  (Dec. 10; Tr. 54).  Therefore, the ALJ concluded that "the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and that a "finding of 'not disabled' is therefore appropriate[.]"  (Id.).[9]

---

[9]  Mendez does not appear to challenge the determination that she can do these specific jobs despite her specific impairments, but more generally challenges the conclusion that she can do any job.  She relies on the VE's testimony that if a person with the same age, educational history, and RFC as Mendez were off task 20 percent of the time within an eight hour workday because of a failure to maintain concentration, persistence, or focus, that person would not be employable.  (Tr. 91).  However, the ALJ did not find that Mendez would be off task 20 percent of the time during an eight hour workday, a finding that is supportable by the record.

Additional factual details relevant to this court's analysis are described below where appropriate.

### III. ANALYSIS

### A. Standard of Review

In this action, Mendez is seeking judicial review of the Commissioner's "final decision" pursuant to the Social Security Act § 205(g), 42 U.S.C. § 405(g) (the "Act"). The Act provides in relevant part as follows:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action …. The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by *substantial evidence*, shall be conclusive ….

42 U.S.C. § 405(g) (emphasis added). The Supreme Court has defined "substantial evidence" to mean "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); accord Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).

As the First Circuit has explained:

> In reviewing the record for substantial evidence, we are to keep in mind that "issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the [Commissioner]." The [Commissioner] may (and, under [her] regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the deter-mination of the ultimate question of disability is for [her], not for the

> doctors or for the courts.  We must uphold the [Commissioner's] findings in
> this case if a reasonable mind, reviewing the record as a whole, could
> accept it as adequate to support [her] conclusion.

Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  Therefore, "the court's function is a narrow one limited to determining whether there is substantial evidence to support the [Commissioner's] findings and whether the decision conformed to statutory requirements."  Geoffroy v. Sec'y of Health & Human Servs., 663 F.2d 315, 319 (1st Cir. 1981) (citations omitted).  "[T]he Court must uphold the Commissioner's determination, 'even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence.'"  Amaral v. Comm'r of Soc. Sec., 797 F. Supp. 2d 154, 159 (D. Mass. 2010) (quoting Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)).

"Even in the presence of substantial evidence, however, the Court may review conclusions of law, and invalidate findings of fact that are 'derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts[.]'"  Musto v. Halter, 135 F. Supp. 2d 220, 225 (D. Mass. 2001) (quoting Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam)) (internal citations omitted).  "Thus, if the ALJ made a legal or factual error, the court may reverse or remand such decision to consider new, material evidence or to apply the correct legal standard."  Ross v. Astrue, C.A. No. 09-11392-DJC, 2011 WL 2110217, at *2 (D. Mass. May 26, 2011) (internal citation omitted).

B.      **Credibility Assessment**

Mendez argues that the ALJ improperly evaluated her credibility and subjective complaints of pain and other physical ailments.  (Docket No. 22 at 8).  In connection with his

RFC assessment, the ALJ considered the plaintiff's hearing testimony, statements about her physical and psychological condition and functioning which she made to medical professionals, her self-reported functional abilities contained in her Social Security Administration function reports and made to the CDI investigator, and her allegation that due to her impairments she is unable to sustain substantial gainful activity. (Dec. 5-9; Tr. 49-53). Although the ALJ found that Mendez's impairments "could reasonably be expected to cause the alleged symptoms," he concluded that her statements concerning the "intensity, persistence and limiting effects of these symptoms" were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Dec. 8; Tr. 52).

Generally, "[t]he credibility determination by the ALJ, who observed the claimant, evaluated [her] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987). This court finds that there is substantial evidence to support the ALJ's credibility determination in this case.

The ALJ considered Mendez's statements concerning the nature, intensity, persistence and limiting effects of her pain and other symptoms. For example, the ALJ considered Mendez's testimony regarding her left sided weakness, left arm pain, weakness and numbness in her right leg, cognitive limitations, fatigue, and anxiety and depression. He considered Mendez's comments regarding the nature and intensity of her pain, as well as her description of the mental and physical limitations she experiences as a result of her symptoms. (Dec. 5; Tr. 49; 73-84).

Additionally, the ALJ reviewed Mendez's medical records in detail, and considered statements Mendez made to her treating physicians and other medical professionals. (Dec. 5-9; Tr. 49-53). He also considered the treatment that Mendez received from her medical providers, and the effect that the treatment had on her symptoms. (See id.). The record thus shows that the ALJ thoroughly considered the relevant factors in connection with his assessment of Mendez's credibility, and that he carried out his obligation to "evaluate the credibility of the claimant's subjective complaints of disabling limitations based on consideration of the entire record[.]" Larlee v. Astrue, 694 F. Supp. 2d 80, 85 (D. Mass. 2010).

Accordingly, this court finds that the ALJ's credibility determination must be upheld on appeal.

### C.      The Assessment of Plaintiff's Mental Health Impairments

Mendez argues that she is disabled due to her depression, anxiety, PTSD, and inability to focus and concentrate. (See Docket No. 19 at 1; Docket No. 22 at 8-9).

On appeal, Mendez does not identify any specific mental health evidence that was part of the record before the ALJ but that the ALJ failed to consider. Rather, Mendez appears to argue that facts exist in the record which could support a different conclusion regarding disability than that reached by the ALJ.

However, as noted above, "factual inferences, credibility determinations, and resolutions of conflicts in the evidence are reserved to the Commissioner[,]" Conte v. McMahon, 472 F. Supp. 2d 39, 46 (D. Mass. 2007) (citing Rodriguez, 647 F.2d at 222), and "the Court must uphold the Commissioner's determination, 'even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence.'" Amaral, 797 F. Supp. 2d at 159

(quoting <u>Rodriguez Pagan</u>, 819 F.2d at 3).  Thus, "[a]s the resolution of conflicts in evidence is the role of the hearing officer, not the Court, it is only necessary in this instance to determine whether there is substantial evidence to support the hearing officer's conclusions."  <u>Green v. Astrue</u>, 588 F. Supp. 2d 147, 153 (D. Mass. 2008) (citing <u>Irlanda Ortiz</u>, 955 F.2d at 769).  This court concludes that there is substantial evidence to support the ALJ's conclusions.

Upon considering the record evidence, the ALJ concluded that Mendez's PTSD and depression were severe impairments (Dec. Finding #3; Tr. 47); that Mendez had a mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration (Dec. 4; Tr. 48); and that with regard to her mental abilities, Mendez had the residual functional capacity to perform work limited to simple, routine and repetitive instructions and only occasional contact with co-workers, supervisors and the public.  (Dec. Finding #5; Tr. 49).  This court finds that the ALJ's assessed RFC is supported by substantial evidence.

Specifically, the ALJ relied on mental status exams that showed "adequate fund of general knowledge and cooperative behavior" and "generally normal memory."  (Dec. 8; Tr. 52).  For example, in a mental status exam conducted at Spectrum Health Systems on July 11, 2014, Mendez was cooperative and well groomed, with an adequate fund of general knowledge and normal memory but impaired recall, limited insight, and a worried and anxious mood.  (Tr. 734; 1053).  A mental status exam conducted on August 14, 2014 showed that Mendez was depressed but with otherwise normal results, though Mendez reported at the time to the practitioner that she had memory problems.  (Tr. 804; 1037).  These findings are consistent

with the ALJ's limitation to simple, routine and repetitive instructions and only occasional contact with co-workers, supervisors and the public.

The ALJ also relied on evidence that Mendez reported improvement in managing anxiety and improved mood with medication. (Dec. 8; Tr. 52). For example, treatment notes from Spectrum on January 15, 2015 report that Mendez was managing her anxiety symptoms more effectively. (Tr. 1024). Treatment notes from Spectrum on June 18, 2015 show that Topira-mate was helping with her mood and preventing headaches, and that she was "less depressed" and "happy and excited" to go on vacation to Florida for a week. (Tr. 1181).

The ALJ further relied on Mendez's own descriptions of daily living from a function report that she signed and dated July 2, 2014 and representations she made to the CDI investigator on January 27, 2016. (Dec. 8-9; Tr. 52-53; 311-18; 1223-33). In her July 2014 function report, Mendez reported that she could prepare her own simple meals daily, talked on the phone, shopped in stores weekly for up to three hours, could drive a car, pay bills, count change, handle a savings account, use a checkbook/money orders, went to doctors' appoint-ments, sometimes folded clothes and sometimes wiped the kitchen counter. (Tr. 311-18). On January 27, 2016, Mendez reported to a CDI investigator that she had no problems driving, recently traded in her car for a newer one and split the payments with her oldest daughter, handled all the money in the household and paid the monthly bills, was then the representative payee for her youngest daughter's social security benefits, would go outside when she needed to, could go outside alone, could take public transportation, could shop and attend scheduled appointments, bathed and dressed herself each morning, could take her medication on a daily

basis without reminder, and was responsible for keeping the apartment clean, including "cleaning, dishes, and doing the laundry." (Tr. 1231-33).

The ALJ's RFC is also supported by substantial evidence in the form of the opinion by State agency nonexamining consultant, Dr. Lukens, which the ALJ gave "significant weight." (Dec. 8-9; Tr. 52-53). After a review of the record evidence before him in December 2014, Dr. Lukens opined that Mendez was able to understand and remember simple instructions; was "not significantly limited" in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; was "not significantly limited" in her ability to sustain an ordinary routine without special supervision; was "not significantly limited" in her ability to work in coordination with or in proximity to others without being distracted by them; was "not significantly limited" in her ability to make simple work-related decisions; was able to engage in superficial social interactions without significant limitations; was able to adapt to changes in the work setting; was "moderately limited" in her ability to carry out detailed instructions and to maintain attention and concentration for extended periods; was "moderately limited" in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, specifically that she would have moderate difficulty sustaining concentration and pace. (Tr. 160-61). In making these findings, the consultant considered Dr. Hentoff's report from his consultative examination of Mendez. (Tr. 162). As detailed below, there is ample evidence in the record supporting the ALJ's implicit rejection of much of Dr. Hentoff's opinion.

The ALJ gave "significant weight" to the State agency findings, explaining that they were "consistent with the substantial evidence of record and the longitudinal treatment record." (Dec. 8; Tr. 52). The ALJ specified that these findings were consistent with treatment notes indicating improvement in mood and functioning with medication and Mendez's reported functional abilities including the ability to take care of her daughter, take public transportation, and go shopping in the community. (Dec. 9; Tr. 53).

Taken together, the treatment notes, the State agency findings, and the reports of activities of daily living in July 2014 and in January 2016, as expressed to the CDI investigator, support the ALJ's finding that Mendez has the residual functional capacity to perform simple, routine, and repetitive instructions when limited to only occasional interaction with the public, co-workers, or supervisors.

Furthermore, in assessing Mendez's RFC, the ALJ supportably gave Ms. Burley's opinion "little weight" as inconsistent with the record as a whole. (Dec. 8; Tr. 52). Based on the entirety of the medical records, treatment notes, and Mendez's descriptions of her abilities, it was not unreasonable for the ALJ to conclude that Ms. Burley's opinion was not representative of Mendez's functional ability. For example, Ms. Burley opined that Mendez had *"no useful ability to function"* in a variety of categories of mental abilities and aptitude, including the ability to "understand and remember very short and simple instructions," "sustain an ordinary routine without special supervision," and "maintain attention for two hour segment." (Tr. 1160-61) (emphasis added). This is inconsistent with Mendez's July and August 2014 mental status exams which were largely normal, treatment notes from June 2015 indicating that Mendez was "less depressed" and was going on vacation to Florida, and Mendez's self-reported

functional capacity as reported to CDI investigators in January 2016, wherein she explained that she could manage her finances, take medication without reminder, take public transportation, go shopping and go for doctor's appointments.

While Ms. Burley was not a treating physician, and the ALJ need not have treated her opinion as such, the ALJ nonetheless provided a sufficient, "specific reason[]. . . supported by the evidence in the case record" for the weight given to her opinion. McNelley v. Colvin, C.A. No. 14-14342-RGS, 2015 WL 3454721, at *4 (D. Mass. May 29, 2015) (quoting Social Security Ruling 96-2p, 1996 WL 374188, at *5 (July 2, 1996)), aff'd, No. 15-1871, 2016 WL 2941714 (1st Cir. Apr. 28, 2016). His treatment of her opinion was therefore sufficient under the Social Security regulations.

While the ALJ did not specifically assign weight to the report of SSA consultative examiner, Dr. Hentoff, when assessing Mendez's RFC, the ALJ took Dr. Hentoff's findings into consideration when concluding that Mendez had moderate difficulties in maintaining concentration, persistence or pace. (Dec. 4; Tr. 48). Moreover, the ALJ assigned "great weight" to the opinion of Dr. Lukens who evaluated Dr. Hentoff's opinion in the context of the administrative record and assessed Mendez's functional capacity. Finally, it is clear that the ALJ implicitly rejected much of Dr. Hentoff's opinion as inconsistent with the whole of the administrative record. Dr. Hentoff stated that Mendez couldn't count backwards from 20 and that given her cognitive state, he would recommend a payee "if she is awarded Social Security Disability Benefits from the state." (Tr. 810; 812). These observations and recommendation are vastly inconsistent with the record, including, for example, Mendez's statements just a month later that she was able to handle money, pay the monthly bills, take medication daily without

reminder, and had just traded in her car for a newer one, and the fact that Mendez also served as her daughter's representative payee.  (Tr. 1232).

While the evidence is clear that Mendez has certain mental impairments and limitations, this court finds that the ALJ's assessed RFC, that Mendez can perform simple, routine, and repetitive instructions when limited to only occasional interaction with the public, co-workers or supervisors, is supported by substantial evidence.

### D.    The Assessment of Plaintiff's Physical Impairments

Mendez also argues that she is disabled due to mobility issues, pain, and neurological issues in her left arm, back pain, headaches, and the side effects of her medication which she claims make her sleep all day and put her at risk of falling.  (See Docket No. 19 at 1; Docket No. 22 at 8-9).

On appeal, Mendez does not identify any specific evidence that was part of the record before the ALJ but that the ALJ failed to consider with regard to her claimed impairments relating to her left arm and back.  Rather, Mendez appears to argue that facts exist in the record which could support a different conclusion regarding disability than that reached by the ALJ.

However, as noted above, "factual inferences, credibility determinations, and resolutions of conflicts in the evidence are reserved to the Commissioner[,]" Conte, 472 F. Supp. 2d at 46 (citing Rodriguez, 647 F.2d at 222), and "the Court must uphold the Commissioner's determination, 'even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence.'"  Amaral, 797 F. Supp. 2d at 159 (quoting Rodriguez Pagan, 819 F.2d at 3).

In considering the evidence regarding Mendez's back pain, left arm pain, and left arm limitations, the ALJ concluded that Mendez had the following severe impairments — degenerative disc disease, cerebrovascular accident, cardiac dysrhythmias, circulatory disorder, and anemia.  (Dec. Finding #3; Tr. 47).  He further concluded that with regard to her physical abilities, Mendez had the residual functional capacity to perform sedentary work but was limited to lifting 10 pounds occasionally and less than 10 pounds frequently; could stand or walk at least four hours in an eight hour day; could sit with normal breaks for about six hours in an eight hour workday; had the occasional ability to climb, balance, stoop, kneel, crouch or crawl but never climb a ladder; and had the occasional ability to push and pull with the left upper extremity.  (Dec. Finding #5; Tr. 49).  This court finds that the ALJ's assessed RFC is supported by substantial evidence.

Specifically, the ALJ relied on physical examinations indicating normal gait and intact neurological functioning.  (Tr. 372; 589; 748; 1298; 1213).  For example, in June 2014, Mendez's primary care physician noted "normal alignment, no visible or palpable defects, normal range of motion, muscle strength 5/5, normal muscle tone, no abnormal movements, no atrophy, stable joints, normal gait, good balance" (Tr. 589), and in an examination in August 2015, there were no neurological deficits noted.  (Tr. 1213).  The ALJ also relied on duplex ultrasound studies indicating patent[10] right carotid and normal arterial flow to the left arm (Tr. 406; 413; 517) and Dr. Khalid's observation of only mild left upper extremity motor dysfunction in July 2014.  (Tr. 748).  The ALJ also noted that Mendez's treatment had been limited with no evidence of

---

[10] "Patent" is defined as "unobstructed".  See https://www.merriam-webster.com/dictionary/patent (last visited June 13, 2018).

sustained care for stroke-related or cardiac-related issues from October 2015 through the date of his opinion. (Dec. 8; Tr. 52).

Further, with respect to her back pain, he relied on a lumbar MRI from July 2014 indicating no significant central canal or foraminal stenosis (Tr. 650-51), and Dr. Goetzler's treatment notes from November 2015, which reported that Mendez felt "great" and was walking for exercise at least a half hour per day. (Tr. 1319).

Furthermore, the ALJ further relied on Mendez's own descriptions of daily living from the function reports, treatment records, and the CDI interview on January 27, 2016 mentioned above, including her abilities to do housework including cleaning, dishes, and laundry, to cook simple meals, bathe and dress herself each morning, go out by herself, shop in stores and go to appointments, drive, take public transportation, travel to Florida for vacation, and walk for exercise. (Dec. 8-9; Tr. 52-53; 311-18; 1223-33).

The ALJ's RFC is also supported by substantial evidence in the form of the opinion by State agency nonexamining consultant physician, Dr. Zuniga, which the ALJ gave "significant weight." (Dec. 8-9; Tr. 52-53). After a review of the record evidence before him in November 2014, Dr. Zuniga opined that Mendez could frequently lift and/or carry 10 pounds, stand and/or walk with normal breaks for a total of four hours, sit with normal breaks for a total of about 6 hours in an 8-hour workday, was unlimited in her ability to push and/or pull (including operation of hand and/or foot controls), and could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs and ladders/ropes/scaffolds. (Tr. 179-81).

In giving "significant weight" to the State agency findings, the ALJ explained that they were "consistent with the substantial evidence of record and the longitudinal treatment

record." (Dec. 8; Tr. 52). The ALJ specified that these findings were consistent with findings of only mild left upper extremity dysfunction, intact neurological findings, ultrasound findings of patent right carotid artery, and stable blood iron levels. (Dec. 8-9; Tr. 52-53). He further explained that the State agency findings were consistent with Mendez's reported ability to care for her daughter, take public transportation and go shopping in the community. (Id.). More-over, despite giving the State agency findings "significant weight," the ALJ, after reviewing the full record, assessed a more limited RFC, by limiting Mendez to only occasionally lifting 10 pounds.

Taken together, the State agency findings, the July 2014 report of activities of daily living, Mendez's January 2016 statements to the DCI investigator, and treatment notes support the ALJ's finding that Mendez can lift 10 pounds occasionally and less than 10 pounds frequently, stand or walk at least four hours in an 8 hour day and sit (with normal breaks) for about 6 hours in an 8 hour workday, and has the occasional ability to climb, balance, stoop, kneel, crouch or crawl but never climb a ladder and the occasional ability to push and pull with the left upper extremity.

In assessing Mendez's RFC, the ALJ supportably declined to give controlling weight to her treating physician, Dr. Goetzler. An ALJ may decline to give controlling weight to a treating physician where the ALJ determines that the treating source opinion is inconsistent with other substantial evidence in the record. See Bourinot v. Colvin, 95 F. Supp. 3d 161, 177 (D. Mass. 2015) ("Where, as here, treating source opinions are inconsistent with other substantial evi-dence in the record, the SSA regulations do not require an ALJ to give the opinions controlling weight."). This is such a case. In granting little weight to the limitations found in Dr. Goetzler's

February 2016 opinion, the ALJ explained that such evidence was inconsistent with the record as a whole, including MRI findings of no significant lumbar stenosis, ultrasound findings of normal arterial flow to the left arm, exam findings of normal gait, and Ms. Mendez's self-reported activities. (Dec. 8; Tr. 52). This court finds that the ALJ's assessed RFC for Mendez's physical impairments is supported by substantial evidence.

Additionally, Mendez argues that the ALJ failed to take into consideration her recurring headaches and the side effects of her medication. (Docket No. 22 at 8). With respect to her headaches, Mendez did not claim headaches as a disabling impairment, and while there is evidence in the medical record that Mendez suffered from headaches, there are no medical opinions in the record specifying that headaches would have an effect on Mendez's ability to work. Furthermore, the ALJ did consider that in May of 2015, Mendez switched medication from Wellbutrin to Topirimate, which, as explained by contemporaneous medical records, helped Mendez with headache prevention. (Tr. 1181; 1185). Furthermore, the ALJ implicitly considered any limiting effects that Mendez's headaches may have had on her functional capacity when considering her activities of daily living in assessing her RFC. For example, he considered that despite her pain and other symptoms, Mendez maintained the ability to bathe and dress herself each morning, go out by herself, shop in stores and go to appointments, drive, and take public transportation. (Dec. 8-9; Tr. 52-53; 1232).

With respect to Mendez's claim that her medications make her drowsy, the ALJ implicitly considered any limiting effects that the side effects of Mendez's medications may have had on her functional capacity when considering her activities of daily living in assessing her RFC. For example, he considered that despite any side effects of her medications, Mendez

maintained the ability to handle money and pay the monthly bills, take medication without reminder, bathe and dress herself each morning, go out by herself, shop in stores and go to appointments, drive, and take public transportation.  (Id.).  Furthermore, there is evidence in the record which suggests that drowsiness did not have the limiting effect that Mendez claims. For example, in July 2015 Mendez reported walking 2-5 miles per day in preparation for her gastric sleeve surgery.  (Tr. 1483).

This court finds that the RFC assessed by the ALJ is supported by substantial evidence.

**E.** **New Evidence Submitted By Mendez To This Court Does Not Justify Remand Under Sentence Six of 41 U.S.C. § 405(g)**

On two separate occasions, Mendez submitted to this court for consideration, additional documents not included in the administrative record.  (See Docket Nos. 22 & 24). This court proceeds as if Mendez is requesting that it exercise its authority under sentence six of 42 U.S.C. § 405(g) to remand the case to the Commissioner for consideration of additional evidence.

"Sentence six of 42 U.S.C. § 405(g) provides that the Court 'may at any time order additional evidence to be taken before the [Commissioner], but only upon a showing that there is new evidence which is material and there is good cause for failure to incorporate such evidence in a prior proceeding.'"  Johnson ex rel. M.C.J. v. Astrue, C.A. No. 11-11243-JLT, 2012 WL 1605984, at *9 (D. Mass. Apr. 12, 2012) (quoting 42 U.S.C. § 405(g)).  "To be material, the evidence must be 'both relevant to the claimant's condition during the time period for which benefits were denied and probative.'"  Id. (quoting Beliveau v. Apfel, 154 F. Supp. 2d 89, 94 (D. Mass. 2001)).  "The concept of materiality requires a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently."  Id.

Furthermore, "an implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previous non-disabling condition." Id. at *10 (quoting Szubak v. Sec'y of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984)).

With respect to her SSDI claim, Mendez bore the burden of establishing that she became disabled within the meaning of the Act on or before June 30, 2014. With respect to her SSI claim, Mendez bore the burden of establishing that she was disabled within the meaning of the Act from December 5, 2013, her asserted disability onset date, through the date of the ALJ's decision, which was May 19, 2016. The ALJ concluded that she had not been under a disability from December 5, 2013 through May 19, 2016. (Dec. 1; Tr. 45).

Docket No. 24 contains 26 pages of additional medical records from Dr. Tomoya Sakai, including progress notes from January 8, 2016, July 2016, October 2016, March 2017, and May 2017, and a pain assessment dated September 8, 2017. The progress note dated January 8, 2016 was part of the administrative record and was considered by the ALJ in his decision. (See Dec. 6-7; Tr. 50-51). Thus, it is not new and remand is not warranted on its basis. The remaining progress notes are not material as they were created after the date of the ALJ's decision and do not contain retrospective assessments of Mendez's level of functioning during the relevant time period before the ALJ. See Johnson, 2012 WL 1605984, at *10.

The pain assessment signed by Dr. Sakai on September 8, 2017 also does not warrant remand under sentence six. This record is not material as it was created too far in time after the relevant time period before the ALJ, and is inconsistent with Dr. Sakai's contemporaneous records in the administrative record regarding Mendez's physical condition. While Dr. Sakai

asserts that "the patient's symptoms and related limitations" detailed in the assessment "apply as far back as 12-05-2013," the materiality of this opinion is significantly limited by the fact that Dr. Sakai did not render this opinion until over three years after that date and only first examined Mendez in January 2016. (Docket No. 24 at 5-11). See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 140 n.3 (1st Cir. 1987) (doctor's ability to shed light on issue of whether or not claimant was incapacitated as of the date plaintiff last met the Act's earning requirements was "seriously curtailed" where doctor never examined plaintiff until some four and one-half years later).

Further undermining the materiality of the pain assessment is the fact that Dr. Sakai cites, as the clinical and laboratory support for his diagnosis causing Mendez's functional limitations, an MRI from December 9, 2016. (Docket No. 24 at 5). Dr. Sakai explains that this MRI indicates "annular tear of the cervical and lumbar discs." However, these diagnoses were not made until after the ALJ's decision in May 2016. (See id. at 5; 18-19). Thus, while this record may show a subsequent deterioration of a previous non-disabling condition, it is not relevant to the claimant's condition during the time period for which benefits were denied, and is therefore not material.

Among the additional medical records that Mendez submitted to this court is a letter from Dr. Goetzler dated August 21, 2017. (Docket No. 22 at 2). This letter highlights Mendez's diagnosis and ailments since her stroke, all of which the ALJ considered in his decision. (See id. (identifying left upper extremity weakness, difficulty with concentration, depression and anxiety, low back pain and muscle spasms)). To the extent that the letter merely identifies

these diagnoses, which were considered by the ALJ, the letter is cumulative to the evidence in the administrative record and does not warrant remand for consideration by the ALJ.

Dr. Goetzler's letter also identifies pain medications that were prescribed to Mendez and explains that the side effects of these medications make Mendez "sleepy and affect her ability to keep a job." (Id.). The letter does not identify the date on which Mendez was prescribed or was taking these medications, which Dr. Goetzler identifies as "clozazepam, valium and tizanidine."[11] With respect to clonazepam, there doesn't appear to be a reference to that medication in the administrative record that was before the ALJ.[12] Thus, the implication is that Mendez was prescribed this medication after the date of the ALJ's decision, and this new information is not material. With respect to tizanidine and Valium, the ALJ considered that Mendez had been prescribed those medications (Dec. 6-7; Tr. 50-51) and assessed Mendez's RFC in part on the evidence of her functional abilities despite being prescribed those medications. Furthermore, in her opinion dated February 18, 2016, which the ALJ did consider, Dr. Goeztler did not identify any of those three medications as having side effects that could impact Mendez's ability to work. (Tr. 1370). Therefore, as Dr. Goetzler's opinion that these medications impact Mendez's ability to work is a new opinion that contradicts the opinion she proffered for the administrative record, there no good cause for failure to have this opinion in the prior proceeding. Additionally, even if there were good cause, there is no reasonable possibility that the new evidence would have influenced the Commissioner to decide Mendez's

---

[11] It appears "Clozazepam" is a typographical error and that Dr. Goetzler meant "clonazepam".

[12] The first reference to clonazepam is in a treatment record by Dr. Sakai dated October 28, 2016 and submitted by claimant for review on appeal.

application differently given that the ALJ considered and relied heavily on the evidence of Mendez's functional capabilities while considering and acknowledging that she had been prescribed Valium and tizanidine. Thus, remand is not warranted on the basis of Dr. Goetzler's August 21, 2017 letter.

Mendez also submitted a mental RFC form dated August 31, 2017 and signed by Inessa Altshuler, LMHC and Susan Richardson, PMH-NP. (Docket No. 22 at 10-13). Ms. Altshuler appears to be a mental health counselor who Mendez saw for psychotherapy sessions at Advocates Community Counseling beginning on May 5, 2016. This record is not material, and remand is not warranted on its basis. While chronic illness must be viewed longitudinally, see Rawls v. Apfel, 998 F. Supp. 70, 77 (D. Mass. 1998), this mental RFC assessment, completed 15 months after the ALJ's decision, is not material where the administrative record contains ample medical evidence of Mendez's mental health impairments from at least April 2014 through February 2016. (Tr. 481; 1020-74; 1176-95; 1306). Thus, there is an adequate amount of documentation in the administrative record over a sufficient period of time to establish the nature of her mental health impairment, and the record need not be reopened to consider the mental RFC assessment from August 2017.

Furthermore, the August 2017 RFC assessment is additionally not material to the time period at issue because it is inconsistent with Ms. Altshuler's treatment notes from May 2016, (around the date of the ALJ's decision), which do not indicate the severity of the limitations she reports in the RFC assessment from August 2017. The reasonable conclusion is that Mendez's condition declined after May 2016 such that the August 2017 evaluation is not relevant to

Mendez's mental state between December 2013 and May 2016, the time period for which benefits were denied. Thus, Ms. Altshuler's August 2017 RFC is not material.

Mendez also submitted mental health records including an adult comprehensive assessment dated March 2, 2016 and signed by Anne Cashman (Docket No. 22 at 85-97), and treatment notes dated March 3, 3016, May 5, 2016, and May 12, 2016. These records are temporally relevant as they were created and relate to the period prior to the ALJ's decision. However, there is no reasonable possibility that these records would have influenced the Commissioner to decide claimant's application differently, and as such they are not material and remand is not warranted on their basis. The intake form dated March 2, 2016 indicated diagnosis of major depressive disorder and PTSD, and the mental status exam completed as part of the intake showed functioning within normal limits for behavior, emotional state, perception, thought content, orientation, insight, judgment, and memory, with exceptions for a sad facial expression, "blocked thought process" and "impaired concentration," all of which is consistent with the evidence that the ALJ considered when assessing Mendez's RFC. The three treatment notes from March and May 2016 indicate that therapy sessions focused on Mendez's stress management, negative thoughts, and relationships and communication with her mother and children and that Mendez was "actively engaged" and "motivated" towards the therapy goals and interventions, which is not inconsistent with the treatment notes from prior sessions already present in the record. (See Tr. 1020-74; 1176-95).

The remainder of the documents submitted on appeal include mental health evaluations, self-assessments, and outpatient psychotherapy notes created after the relevant time period which do not contain retrospective assessments of Mendez's level of functioning

during the relevant time period.  Accordingly, those records are not material and do not justify remand under sentence six of 42 U.S.C. § 405(g).

### IV. <u>CONCLUSION</u>

For all the reasons detailed herein, this court finds that the Commissioner's decision that Mendez was not "under a disability," as defined in the Social Security Act, was supported by substantial evidence and that the additional records submitted for review on appeal do not warrant a remand under sentence six of 42 U.S.C. § 405(g).  Therefore plaintiff's motion to reverse the Commissioner's decision (Docket No. 19) is DENIED and the defendant's motion to affirm the Commissioner's decision (Docket No. 20) is ALLOWED.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge